United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY FREDIANELLI, | No. C-11-3232 EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| STEPHAN JENKINS, *et al.*, | |
| Defendants. | **(Docket No. 171)** |
| _____/ | |

## I.    INTRODUCTION

Defendants Stephan Jenkins; Bradley Hargreaves; Third Eye Blind, Inc.; 3EB Touring, Inc.; and Stephan Jenkins Productions, Inc. bring the current motion for summary judgment or, alternatively, partial summary judgment of Plaintiff Anthony Fredianelli's First Amended Complaint ("FAC").[1]  Plaintiff's complaint includes six causes of action stemming from his participation as lead guitarist for the rock group Third Eye Blind ("the Band") from 1993 to 1994 and from 2000 to 2009, and his alleged co-ownership of the Band and related entities.  Jenkins is the founder, singer, and leader of the Band, and Hargreaves its drummer.  The six causes of action in the FAC are for (1) breach of contract; (2) reasonable value of services performed (Plaintiff's "quantum meruit" claim);

---

[1]  In addition, Defendants moved for summary judgment on the cross-complaint of the Band's former manager, Eric Godtland, who also moved for leave to amend his cross-complaint. *See* Defs.' Mot. for Summ. J. ("Defs.' Mot."), Docket No. 218, at 21-24; Mot. to Amend/Correct Cross-Compl., Docket No. 166.  However, the parties indicated that Godtland and Defendants have reached a settlement in this matter and wish to take these matters off calendar. *See* Joint Case Management Statement, Docket No. 223, at 2:5-11.  Thus, this Order does not address any of the Godtland claims.

**United States District Court**
For the Northern District of California

1  (3) constructive trust; (4) accounting; (5) declaratory relief regarding ownership of copyrights; and

2  (6) declaratory relief regarding ownership of trademarks.  FAC, Docket No. 137-1, ¶¶ 79-113;

3  Order, Docket No. 152, ¶ 4 (making FAC the operative complaint).  Defendants now move for

4  summary judgment on each cause of action.

5      For the reasons stated herein, the Court **GRANTS** Defendants' motion for summary

6  judgment in its entirety except to the extent Plaintiff's claims for breach of contract and an

7  accounting are based on his not receiving his full share of net touring revenues, irrespective of his

8  status as a co-owner of the Band, as discussed further below.

9  ## II.   EVIDENTIARY OBJECTIONS

10      The only evidence submitted by Plaintiff in opposition to Defendants' motion for summary

11  judgment is a declaration with seven attached exhibits filed alongside Plaintiff's opposition brief as

12  well as a supplemental declaration with a single exhibit filed following Defendants' reply brief.  *See*

13  Fredianelli Decl., Docket No. 213-1; Supp. Fredianelli Decl., Docket No. 216.  Defendants

14  submitted fifty-seven separate objections to the evidence Plaintiff submitted in support of his

15  opposition brief and objected separately to Plaintiff's supplemental declaration.  *See* Defs.' Objs.,

16  Docket No. 214-1; Defs.' Objs. to Supp. Decl., Docket No. 219.  "Before ordering summary

17  judgment in a case, a district court must not only provide the parties with notice and an opportunity

18  to respond to adverse arguments, it must also rule on evidentiary objections that are material to its

19  ruling."  *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010).  Material to this Order are

20  Defendants' objections to Fredianelli's supplemental declaration, several sham affidavit objections

21  to Fredianelli's initial declaration, and several hearsay objections to Fredianelli's initial declaration.

22  A.   Supplemental Declaration

23      Plaintiff's supplemental declaration includes a single exhibit of alleged deposition

24  corrections dated December 2009 for a March 2009 deposition he gave in the matter of *Jenkins v.*

25  *Godtland*, Case No. CGC-08-476453 (Cal. Super. Ct. San Francisco County) (hereinafter, the

26  "*Godtland* case").  *See* Docket No. 216.  The Court need not consider Plaintiff's supplemental

27  declaration and attached exhibit because (1) it was filed in an untimely manner pursuant to Local

28

United States District Court

For the Northern District of California

1   Rule 7-3(d); (2) it violates the sham affidavit rule; and (3) the deposition corrections were untimely

2   pursuant to California law.

3          First, Local Rule 7-3(d) provides that, once a reply is filed, "no additional memoranda,

4   papers, or letters may be filed without prior Court approval," except for objections to new evidence

5   filed with the reply and notices of relevant judicial opinions published after the date of the

6   opposition papers.  Here, Plaintiff's new evidence does not fall within either exception and Plaintiff

7   did not seek the Court's approval to file his supplemental declaration.

8          Second, the sham affidavit rule provides that "a party cannot create an issue of fact by an

9   affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d

10  262, 266 (9th Cir. 1991).  Similarly, deposition corrections may not "include changes offered solely

11  to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment."

12  *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225 (9th Cir. 2005).  There are

13  two limitations on a district court's discretion to invoke the sham affidavit rule: (1) "the district

14  court must make a factual determination that the contradiction was actually a 'sham'"; and (2) "the

15  inconsistency between a party's deposition testimony and subsequent affidavit must be clear and

16  unambiguous to justify striking the affidavit."  *Van Asdale v. Internat'l Game Tech.*, 577 F.3d 989,

17  998-99 (9th Cir. 2009) (quotation marks and citation omitted).

18         Here, the affidavit claiming changes were made to the deposition transcript is a sham.

19  Plaintiff has not submitted any evidence to corroborate that these deposition corrections were, in

20  fact, made in December 2009 and not instead made in response to Defendants' summary judgment

21  motion in this case.  Furthermore, the inconsistency between the original deposition testimony and

22  the new affidavit is clear.  While much of Defendants' case rests on the argument that Plaintiff had

23  no effective business or creative control in the Band, as testified to during Plaintiff's deposition in

24  the *Godtland* case, Plaintiff's deposition corrections directly contradict this testimony.  *See* Supp.

25  Fredianelli Decl. Ex. H at 4-5.

26         Lastly, under California law, Plaintiff only had thirty days following his March 11, 2009

27  deposition within which to make corrections; yet, he allegedly waited until December 2009 to do so.

28

United States District Court

For the Northern District of California

1    *See* Cal. Code Civ. Proc. § 2025.520(b); Fredianelli Decl. ¶ 43.  Changes to the transcript would be

2    barred under California law.

3            Plaintiff suggests that, nevertheless, he should not be bound by the transcript because he

4    "made several attempts to get [his] original deposition transcript so [he] could make changes,"

5    including calling his attorney's office the day after the deposition and leaving "a message that [he]

6    would like to see the transcript as soon as possible."  Fredianelli Decl. ¶ 41.  In California, "[t]he

7    attorney is authorized by virtue of his employment to bind the client in procedural matters arising

8    during the course of the action but he may not impair the client's substantial rights or the cause of

9    action itself."  *Linsk v. Linsk*, 70 Cal. 2d 272, 276 (1969).  Cases discussing when an attorney has

10   impaired a client's substantial rights or the cause of action itself do not deal with tactical or

11   logistical decisions made during discovery, but rather instances where an attorney, by virtue of his

12   conduct, has waived entire causes of action.  *See, e.g.*, *Daley v. Butte County*, 227 Cal. App. 2d 380,

13   391-92 (1964) (client not bound by attorney neglect resulting in dismissal for lack of prosecution).

14   On the other hand, "[t]rial counsel is authorized to exercise his independent judgment with respect to

15   strategic litigation decisions."  *Cadle Co. v. World Wide Hospitality Furniture, Inc.*, 144 Cal. App.

16   4th 504, 510 (2006).  Thus, even if the attorney's failure to send Plaintiff a copy of his deposition

17   transcript was due to negligence or mistake, Plaintiff is still bound by his attorney's conduct.  *See*

18   *Alferitz v. Cahen*, 145 Cal. 397, 400 (1904) ("Where such questions of negligence and mistake arise,

19   there must always come a time when, notwithstanding the hardship to the client, he must be bound

20   by the errors and omissions of his attorney.").  In short, Mr. Fredianelli is bound to his deposition

21   testimony.

22           Thus, the Court sustains Defendants' objections to Plaintiff's alleged deposition corrections

23   and Plaintiff's original deposition transcript stands unaltered.

24   B.      Sham Affidavit Objections to Initial Declaration

25           Similar to their objections to Fredianelli's deposition corrections, Defendants' sham affidavit

26   objections 12, 13(b), 16(b), 18(b), 21, 23(a), 30(c), 35(b), 36(b), and 37(a) each refer to sections of

27   Fredianelli's declaration wherein he states that he had a say in the business and creative decisions of

28   the Band and that Jenkins did not have unilateral authority to make decisions on behalf of the Band,

1   including decisions on whether or not to oust other musicians from the Band.  *See* Defs.' Objs.,

2   Docket No. 214-1.  However, in his deposition Plaintiff testified that, up until March 2009, he never

3   gained a say in the business and creative decision-making of the Band and that "Stephan leads."  *See*

4   Fredianelli Dep. 78:20-22, 80:5-8.  He further testified that "Stephan, basically, told [him] that [he]

5   would have no role in the final decisions, in the decision making of the band" and that "[Jenkins]

6   made an analogy as if he would be the United States and we would be smaller countries and he

7   would – if he wanted to ask for advice, he would ask," but "[a]t the end of the day, he would reserve

8   the right to make the decision and that that would not change."  *Id.* at 227:5-6.  Lastly, he testified

9   that Jenkins had the authority to fire him.  *Id.* at 243:21-244:8.  Thus, as noted above, Plaintiff's

10  declaration is inadmissible under the sham affidavit rule to the extent it contradicts this unequivocal

11  deposition testimony.

12  C.      Hearsay Objections to Initial Declaration

13          Of Defendants' various hearsay objections, objections 8(a) and 11(b) are material to this

14  Order.  Objection 8(a) refers to paragraph 9 of Fredianelli's declaration, wherein he states that

15  Godtland "said the band was ready," went over "that all members, including Stephan Jenkins, were

16  employees of the corporations as well as owners," and "told [Fredianelli] he had consulted with the

17  band by conference call and that the points of our conversation were approved by the band."  *See*

18  Defs.' Objs., Docket No. 214-1, at 8.  These statements are hearsay; Plaintiff has not cited an

19  exception to hearsay.  There is no showing, for instance, that Godtland made these statements as an

20  agent of Jenkins on a matter within the scope of that relationship under Fed. R. Evid. 801(d)(2)(D).

21  Plaintiff may not use them as evidence for the truth of the matters asserted:  that the band was ready,

22  that all members were employees as well as owners of the corporations, or that Godtland consulted

23  with the Band by conference call and the Band members approved the points of his conversation

24  with Plaintiff.  The objection on this ground is sustained.

25          Objection 11(b) refers to paragraph 12, in which Plaintiff states that Godtland "told [the

26  Band], if we could just get Stephan Jenkins to focus and finish one new song of lyrics, Rhino

27  Records, wanted to release a greatest hits package in 2005, instead of in 2006 when contractual

28  rights belonging to Rhino would vest and allow them to do so without additional permission from

United States District Court

For the Northern District of California

1    3eb" and that the Band "lost a million dollar advance from that failure that Rhino would have paid

2    3eb in 2005 for the right to release a greatest hits record with additional new songs."  Defs.' Objs.

3    11.  As above, both statements are hearsay.  The objection on this ground is sustained.

### III.    LEGAL STANDARD

5        Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if

6    the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

7    affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

8    party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is genuine

9    only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See*

10   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of

11   evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for

12   the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in

13   the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

14   nonmovant's favor.  *See id.* at 255.

15       Where the movant has the ultimate burden of proof at trial, it may prevail on a motion for

16   summary judgment only if it affirmatively demonstrates that there is no genuine dispute as to every

17   essential element of its claim.  *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d

18   474, 480 (9th Cir. 2000).  Once it has met the initial burden of showing the absence of any genuine

19   dispute, the burden shifts to the opposing party to present "'significant probative evidence tending to

20   support its claim or defense.'"  *Id.* (quoting *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d

21   1551, 1558 (9th Cir. 1991)).  In contrast, where the nonmovant has the ultimate burden of proof, the

22   movant may prevail on a motion for summary judgment simply by pointing to the nonmovant's

23   failure "to make a showing sufficient to establish the existence of an element essential to [the

24   nonmovant's] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### IV.    FACTUAL AND PROCEDURAL BACKGROUND

26       The following facts are viewed in Fredianelli's favor.  Nearly all are based on Fredianelli's

27   declaration except where it is barred by Defendants' evidentiary objections.  Where the declaration

28   is silent as to an issue and does not rebut Defendants' proffered evidence, such facts are considered

United States District Court

For the Northern District of California

1  undisputed.

2  A.     Fredianelli's Beginnings with Third Eye Blind

3         Plaintiff Anthony Fredianelli met Eric Godtland and Defendant Stephan Jenkins in early

4  1993, helping Jenkins form the band Third Eye Blind ("the Band").  Fredianelli Decl. ¶ 2.  Godtland

5  served as the Band's manager and funded the Band's startup costs.  *Id.*  From 1993 to 1994,

6  Fredianelli traveled back and forth from Nevada, where he lived, to San Francisco, California, where

7  the Band was based, to rehearse, record, write songs, and play gigs.  *Id.*  However, Jenkins

8  eventually told Fredianelli that the Band was going to go forward with Kevin Cadogan as its guitar

9  player. *Id.*

10        It is undisputed that, in or about 1996 to 1997, after Fredianelli was no longer in the Band,

11  Jenkins formed three corporate entities:  Third Eye Blind, Inc., which was to handle various

12  financial aspects of the band including receipt of music royalties; Stephan Jenkins Productions, Inc.,

13  which was to handle the various expenses associated with recording and producing the recording of

14  songs; and 3EB Touring, Inc., which was to handle the financial aspects of the Band's touring and

15  merchandise activities.  Jenkins Decl., Docket No, 218-1, ¶ 7.  It is undisputed that Jenkins was the

16  sole shareholder of these corporations, as well as the president and chairman of their boards.  *Id.*

17        In late 1999, Jenkins asked Fredianelli if he would consider touring with the Band as a utility

18  musician.  Fredianelli Decl. ¶ 4; Jenkins Decl. ¶ 8.  Fredianelli became a "hired musician" of the

19  Band in approximately January 2000, and considered himself an employee.  Jenkins Decl. Ex. A

20  (Fredianelli Dep.), at 43:20-44:12.  Once Fredianelli began rehearsing with the Band, the Band

21  voted to fire Cadogan.  Fredianelli Decl. ¶ 5.  Brad Hargreaves, drummer for the Band, recounted to

22  the rest of the Band, including Fredianelli, how he let Cadogan know that he was being fired, citing

23  the "3eb band agreement." *Id.*  Fredianelli was immediately promoted to lead guitarist of the band.

24  *Id.*  Cadogan subsequently sued the Band.  *See id.* ¶ 6.  As lead guitarist, Plaintiff earned $1750 per

25  week with a $1000 weekly retainer for weeks when there was no work.  *Id.*

26        At the time Fredianelli was hired by the Band, Arion Salazar, the Band's bass player,

27  Jenkins, and Godtland told him that he would have to "pay [his] dues" during a two-year

28  "probationary period," after which he would officially be a Band member like they were and

7

**United States District Court**
For the Northern District of California

participate as a full fledged member and co-owner of the Band.  *Id.* ¶ 6; *see* Fredianelli Dep. 52:11-22.  Salazar explained that "the band made big decisions together, like firing Kevin Cadogan for example, and that each member had an equal vote."  Fredianelli Decl. ¶ 6.

B.      The Agreement

In or around late 2002 or early 2003, Salazar told Fredianelli that "the band['s] agreement ["the Agreement"] was affirmed through the closing of the Cadogan litigation."  Fredianelli Decl. ¶ 8. Godtland confirmed this fact.  *Id.*  Salazar told Fredianelli that "he had a lawyer who was working out 'vesting the shares' of 3eb to the shareholders, i.e. the band members."  *Id.*  Godtland told Fredianelli that the rest of the band agreed that Fredianelli "could begin being se[n]t all corporate and shareholder documentation from David Rawson, [the Band's accountant,] which began, and [Fredianelli] was told by Eric Godtland was information no different from Stephan Jenkins (sic)."  *Id.*; Rawson Decl., Docket No. 171-5, ¶ 5.

Subsequently, Godtland set up a meeting with Plaintiff "in or around early March of 2003, where he walked [Plaintiff] through his management agreement, and the interim agreement, going over his management agreement line by line, but also going over general dynamics of the band['s] two pass through corporations, that all members, including Stephan Jenkins, were employees of the corporations as well as owners and that [Plaintiff] in essence was agreeing to sharing the expenses of funding the business, which would include making records, to which [Plaintiff] would receive an equal share of proceeds."  Fredianelli Decl. ¶ 9.  "Eric Go[d]tland, 3eb's manager and representative to the outside world, told [Plaintiff] he had consulted with the band by conference call and that the points of [Godtland and Plaintiff's] conversation were approved by the band."  *Id.*  Regarding the Band's agreement, Godtland testified in the *Godtland* case that

> [a]t each stage of band members, they agreed that they would take the shareholder agreements, sign them and distribute the shares.  That happened while Cadogan was in the band, that happened again when Cadogan was out of the band with Arion, and that happened again when Tony joined.
>
> What the band members said to each other with me there was that they were going to distribute these shares and they were going to sign off on these documents, and Stephan would distribute the shares to each of them.

United States District Court

For the Northern District of California

1  Godtland Dep. 857:5-16.

2      Although Plaintiff alleges in his complaint that "[d]uring the Meeting, Plaintiff accepted the

3  Band's offer to become a full partner according to the terms of the Agreement, as that offer was

4  conveyed to him by the Band's manager and agent, Eric Godtland," FAC ¶ 34,[2] he did not testify to

5  such in his declaration.  Fredianelli submitted no admissible evidence that he accepted the Band's

6  offer.

7      Defendants have submitted a document produced by Plaintiff in this matter titled "Third Eye

8  Blind Inter Party Agreements" (the "Agreement"), which is presumably the "interim agreement"

9  referenced by Plaintiff.  *See* Greenberg Decl. Ex. B.  The Agreement consists of two separate

10 sections, titled "Business Structure (entities)" and "Employment Agreements."  Greenberg Decl. Ex.

11 B.  The Business Structure section provides that the Band members "shall be the sole owners in

12 equal economic shares of any and all issued and outstanding shares of any corporation(s) or other

13 business entities conducting business for or on behalf of the Group . . . including but not limited to

14 Third Eye Blind, Inc. and Third Eye Blind Touring, Inc."  *Id.* at 1.  It then states that each member

15 "shall have voting interests equal to their economic interests in the Corporation(s)" and requires

16 majority approval "with respect to business and creative decisions of the Corporation(s) or the

17 Group," such as "approval of recording budgets."  *Id.* at 1-2.  Towards the end of the Business

18 Structure section, it states in handwriting that touring revenue will be split evenly, such that 25%

19 goes to each of Salazar, Hargreaves, Fredianelli, and Jenkins.  *Id.* at 5.  It also provides that

20 merchandise royalties would be divided such that 28% would go to Salazar, 19% to Hargreaves,

21 10% to Fredianelli, and 43% to Jenkins.  *Id.*

22  —————————————

23      [2] In his complaint, but not in his declaration, Plaintiff references a document titled "Third
   Eye Blind Inter Party Agreements," (the "Agreement") stating that, during their March 2003
24 meeting, "Mr. Godtland showed Plaintiff both the Agreement and explained to him that the Band
   was operating under the Agreement and he would be an equal owner in all of the Band's various
25 ventures, with the rights and responsibilities as set forth in [] the Agreement."  FAC ¶¶ 22-26, 31-32.
   In addition, Plaintiff alleges in his complaint, but not his declaration, that "[d]uring the Meeting,
26 Plaintiff accepted the Band's offer to become a full partner according to the terms of the Agreement,
   as that offer was conveyed to him by the Band's manager and agent, Eric Godtland."  *Id.* ¶ 34.
27 Plaintiffs' unverified complaint is inadmissible for these facts.  *See Celotex Corp. v. Catrett*, 477
   U.S. 317, 324 (1986) ("Rule 56(e) . . . requires the nonmoving party to go beyond the
28 pleadings . . . .").

United States District Court

For the Northern District of California

The Employment Agreements section of the Agreement provides that each Band member is entitled to an "[a]mount equal to their respective Economic Interest in the net profits of the Corporation(s)," among other forms of compensation. *Id.* at 7-8. The Agreement contains different provisions for compensation following terminations based on whether the termination was "for cause" or without cause. *See id.* at 8-11.

C.   Operation of Band Following Plaintiff Becoming a Member

In line with the Agreement, upon his becoming a full-fledged member of the Band, Plaintiff ceased receiving the weekly retainer he had received since joining the Band in 2000 and began to receive 25% of touring revenue. Fredianelli Dep. 54:25-55:11, 72:16-73:5. However, contrary to the Agreement and as admitted at his deposition in the *Godtland* case, Plaintiff did not begin to have a role in the decision-making process of the Band and did not have a say in business decisions, where to tour, legal matters, creative decisions, or what expenses to incur. *Id.* at 78:2-80:15. Rather, Jenkins "would make those decisions because he was the leader." *Id.* at 80:5-8. In characterizing the decision-making structure of the Band, Plaintiff testified that it was not a "democracy." *Id.* at 80:11-15. Rather, Jenkins told Plaintiff that Plaintiff "would have no role in the final decisions, in the decision making of the band." *Id.* at 227:5-10. "[Jenkins] made an analogy as if he would be the United States and [the rest of the Band] would be smaller countries and he would – if he wanted to ask for advice, he would ask." *Id.* at 227:11-14. "At the end of the day, he would reserve the right to make the decision and that that would not change." *Id.* at 227:14-16. Plaintiff conceded that, although "[f]iring someone in a band is a big decision," Jenkins had the authority to fire him. *Id.* at 244:2-8. Moreover, Plaintiff does not dispute that shares in the corporations conducting business for the Band were never distributed to Plaintiff or any member of the Band other than Jenkins. *See* Jenkins Decl. ¶ 7.

A February 23, 2008 email from Plaintiff to the Band's business manager corroborates his testimony about the Band's decision-making structure. *See* Rawson Decl. Ex. A. In the email, Plaintiff indicates that Jenkins, not the collective Band, was negotiating each Band member's share of the touring income, writing that "SJ and I sat down and had a talk" regarding a new agreement as to touring income, that "Stephan [Jenkins] has this same plan in mind for Brad [Hargreaves]-but as

United States District Court

For the Northern District of California

1    of right now they don't have an agreement," that Plaintiff was "going to be asking Eric [Godtland]-

2    for a little bit of breathing room in regards to [Plaintiff's] management commission," and that he did

3    not "know what Stephan [Jenkins] has in mind for [Godtland] in general."  *See id.*

4         Furthermore, it is undisputed that contrary to the Agreement, Fredianelli did not initially

5    share in the merchandising royalties.  Rather, Jenkins took the net proceeds from merchandise sales,

6    and only came to share such revenue four years later, in 2007, at which point Jenkins received 50%

7    of net merchandise proceeds, Hargreaves received 35%, and Plaintiff received 15%, terms which

8    were not consistent with the Agreement.  Jenkins Decl. ¶ 14.

9    D.   Changes Following Plaintiff Becoming a Band Member

10        Shortly after Plaintiff's March 2003 meeting with Godtland, Godtland arranged a band

11   meeting in Miami where he explained to each Band member that, since the Band no longer had a

12   record company, all expenses would be paid from the Band's touring revenue, including non-touring

13   expenses such as the Band's recording expenses.  Fredianelli Decl. ¶ 10.  The Band agreed to the

14   decision to pay non-touring expenses out of the net touring revenue.  *See id.* ¶ 37.

15        From 2004 to 2007, Jenkins all but abandoned the Band.  *Id.* ¶ 13.  Plaintiff stepped into the

16   void and took over the leadership role for the Band, engaging in a variety of marketing activities on

17   behalf of the Band, such as building the Band's first Myspace and Facebook pages as well as

18   reaching out to the Band's fanbase through the "Village Churchyard" website.  *Id.* ¶ 15.

19        In 2005, Jenkins changed Salazar's share of the net touring revenue to less than 25%, with

20   the remaining funds shared equally by Plaintiff, Jenkins, and Hargreaves.  Jenkins Decl. ¶ 13.  It is

21   undisputed that, in June 2006, Salazar left the Band, and the remaining three musicians continued to

22   share the net touring revenue equally, such that each member took home one-third of the net touring

23   revenue.  *See* Fredianelli Decl. ¶ 19; Jenkins Decl. ¶ 13; Rawson Decl. ¶ 11.

24        In or around early 2008, Jenkins replaced Godtland as manager for the Band.  Fredianelli

25   Decl. ¶¶ 20-22.  In his first act as manager, Jenkins approached Fredianelli in January 2008 about

26   reducing his share of the touring revenue back to 25%.  *Id.* ¶ 22; Jenkins Decl. ¶ 13; Fredianelli Dep.

27   123:12-125:14.  Fredianelli told Jenkins that he "would tentatively agree to making this one change

28   to the deal [they] had in place, but told him strictly that it would be the only point [Fredianelli]

United States District Court

For the Northern District of California

1    would be willing to negotiate upon."  Fredianelli Decl. ¶22.  Plaintiff told Jenkins he would make

2    that one concession "contingent on [his] income not going down" from the $292,000 he earned

3    touring in 2007.  *Id.*

4    E.    Godtland Litigation and Plaintiff's Termination from the Band

5         Following Godtland's ouster as manager for the Band, Jenkins wished to sue him.  *Id.* ¶ 23.

6    Jenkins threatened that if Plaintiff and Hargreaves "did not agree to sue Godtland, Jenkins would

7    pursue other projects, leaving the band without a lead singer and mak[ing] it impossible for 3eb to

8    deliver the new album Jenkins had been promising [Plaintiff], Hargreaves and Third Eye Blind fans

9    for years."  *Id.*  Jenkins indicated on several occasions "that he already was rich and did not need

10   Third Eye Blind anymore, but that [Plaintiff] and Brad Hargreaves did, so [Plaintiff] had better go

11   along, as he had convinced Brad [Hargreaves] to do, or [Plaintiff and Hargreaves] would lose

12   everything."  *Id.*  Ultimately, the Band decided to proceed with the litigation against Godtland.  *Id.*

13   In his deposition, Plaintiff testified he had no say in legal decisions of the band.  Fredianelli Dep.

14   78:12-13; 79:9-21.

15        During the course of the *Godtland* litigation, Plaintiff gave a deposition in March 2009, in

16   which he testified that he had never seen a management contract with Godtland and that he had

17   effectively no control over the Band.  Fredianelli Decl. ¶ 40; Fredianelli Dep. 77:22-80:15.

18   Approximately nine months later, in December 2009, he contacted Godtland to apologize about his

19   testimony and expressed a desire to make changes to his deposition.  Fredianelli Decl. ¶ 42.  About a

20   week after Plaintiff's conversation with Godtland, Plaintiff perceived that Jenkins was angry with

21   him for the recantation of his deposition testimony.  *Id.* ¶ 44.  Plaintiff played his last show with the

22   Band on December 31, 2009, after which he was effectively frozen out of the Band.  *Id.*  He was

23   never formally terminated for cause or any other reason.  *Id.*

24   F.    Intellectual Property Dispute

25        In early 2009, Jenkins sent Plaintiff an email with a proposal for publishing splits.

26   Fredianelli Decl. ¶ 25.  Fredianelli pointed out to Jenkins and Tim Mandelbaum, the Band's

27   attorney, that he did not agree with the split suggestions, as the splits were too low and Jenkins

28   neglected to include four songs for which Plaintiff was clearly an author.  *Id.*  The Band released a

United States District Court

For the Northern District of California

1   digital EP titled "Red Star" in November 2008 and a full-length album titled "Ursa Major" in

2   August 2009, for which Plaintiff authored or co-authored many of the new songs. *Id.* ¶ 26. Yet,

3   Jenkins and Mandelbaum failed to credit Plaintiff for those works. *Id.* ¶ 26. Plaintiff never assigned

4   any of his share of Third Eye Blind song rights or his share of the masters to Jenkins or any third

5   party, yet Jenkins registered them in the Band's corporations. *Id.* ¶ 29. Plaintiff eventually hired an

6   attorney, Howard King, to work on his splits. *Id.* ¶ 33. King resolved the splits dispute in June

7   2010. *Id.*

8       Despite the resolution of the dispute over publishing splits, Plaintiff asserts that he is owed

9   revenue from several other sources, including: a deal with Megaforce MRI involving $1 million in

10  advances of which Plaintiff would receive one-third; $1 million in sales from the Megaforce deal

11  from which Plaintiff should have received his royalties; Plaintiff's song "Can You Take Me" being

12  used in the video game "Guitar Hero V"; "synch revenue"; ringtones; and royalties from the sale of

13  a live record to which Plaintiff contributed. *Id.* ¶¶ 33-34, 46.

14                      **V.   DISCUSSION**

15  A.   Breach of Contract (First Cause of Action)

16      This cause of action involves two separate legal theories: (1) that there existed an express

17  contract between the parties conferring on Plaintiff co-ownership of the Band; and (2) that the

18  parties' course of conduct evidenced an intent for Plaintiff to be a partner even absent an express

19  partnership agreement. In addition, Plaintiff argued, but did not plead in his complaint, that

20  Defendants breached a profit-sharing agreement with him, regardless of his status as a co-owner of

21  the Band.

22         1.   Express Contract

23      First, Defendants dispute Plaintiff's allegation that he entered an express contract, the

24  Agreement, to become a co-owner of the Band. While both parties use the term "partner" and

25  "partnership" throughout their briefs, this terminology appears to be inapposite with respect to the

26  Agreement; the Agreement, as produced by Defendants, contemplates that Plaintiff will be a

27  *shareholder* in "any corporation(s) or other business entities conducting business for or on behalf of

28  the Group . . . ." Greenberg Decl., Docket No. 171-3, Ex. B.

a.     Statement of Law

To prevail on his breach of contract claim, Plaintiff must prove (1) the existence of a contract, (2) Plaintiff's performance or excuse for non-performance, (3) Defendants' breach of the contract, and (4) damage to Plaintiff resulting from such breach. *See Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d 887, 913 (1971). Here, Defendants only contest the first element, arguing that Plaintiff cannot show the existence of a contract establishing him as a co-owner of the Band. *See* Defs.' Mot., Docket No. 171, at 13-17. In order to show the existence of a contract, Plaintiff must produce evidence showing (1) "[p]arties capable of contracting"; (2) "[t]heir consent"; (3) "[a] lawful object"; and (4) "sufficient cause or consideration." Cal. Civ. Code § 1550.

Here, the lawfulness of the object of the Agreement and consideration are not at issue. Rather, the dispute centers on whether Jenkins and the other Band members mutually consented to be bound by the Agreement or, if not, if Godtland had the authority to bind them to the terms of the Agreement.

b.     Consent of Band Members

Plaintiff's declaration and the attached excerpts of Godtland's deposition in the *Godtland* case identify only four instances where the Agreement came up among the other Band members: (1) when Hargreaves cited the "3eb band agreement" after the Band terminated Cadogan; (2) when Salazar, Jenkins, and Godtland told Plaintiff when he was hired by the Band in 2000 that, after a two-year probationary period, Plaintiff would officially be a full fledged Band member and co-owner of the Band; (3) when Salazar told Plaintiff that the Band's agreement "was affirmed through the closing of the Cadogan litigation" and that "he had a lawyer who was working out 'vesting the shares' of 3eb to the shareholders, i.e. the band members," and Godtland confirmed this fact; and (4) when the Band "agreed that they would take the shareholder agreements, sign them and distribute the shares." *See* Fredianelli Decl. ¶¶ 6, 8; Godtland Dep. at 857:5-16. In addition, the written Agreement submitted by Defendants is itself potential evidence of the existence of a contract. *See* Greenberg Decl. Ex. B.

The first and third instances are not offers; they evidence no consent by the Band members to enter into a current agreement with Plaintiff. To the extent the third instance refers to an agreement

14

United States District Court

For the Northern District of California

1    being "affirmed," the statement is ambiguous:  it does not indicate what the agreement is, what is

2    meant by its affirmation, who affirmed it, or whether Plaintiff's inclusion in the agreement was part

3    of the affirmation.  Moreover, these conversations with Salazar occurred before Fredianelli was

4    made a member of the Band, suggesting that any agreement that he be a co-owner of the Band could

5    not have been in effect at that time.

6         The second instance, on the other hand, is, at best, an agreement to enter into a contract two

7    years in the future.  In California, the statute of frauds requires that "[a]n agreement that by its terms

8    is not to be performed within a year from the making thereof" be reduced to writing.  Cal. Civ. Code

9    § 1624.  Here, the promise to make Plaintiff a co-owner after a two year probationary period would

10   thus be subject to the statute of frauds, as there is no way in which it could be performed in less than

11   a year.  Plaintiff has not produced any writing indicating this promise, and thus it could not serve to

12   create a contract.  *Cf.* 1 Witkin, Summary 10th (2005) Contracts, § 366 (a conditional contract must

13   be one potentially performed within one year).

14        As for the fourth instance based on Godtland's testimony that the Band intended to sign the

15   shareholder agreements and distribute the shares that testimony is inadmissible hearsay.  Even if it

16   were admitted to show an intent of the Band members to sign a shareholder agreement and distribute

17   the shares in the future, "an agreement that parties will, in the future, make such contract as they

18   may then agree upon amounts to nothing."  *Kerr Glass Mfg. Corp. v. Elizabeth Arden Sales Corp.*,

19   61 Cal. App. 2d 55, 56 (1943).  There is no evidence that the parties had agreed on specific terms for

20   this future agreement.  The general rule in California is "that where any of the essential elements of

21   a promise are reserved for the future agreement of both parties, no legal obligation arises 'until such

22   future agreement is made.'"  *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1256

23   (2002) (quoting *City of Los Angeles v. Super. Ct.*, 51 Cal. 2d 423, 433 (1959)).

24        The uncertainty here is underscored by the fact that, even if Godtland was referring to the

25   draft written Agreement described above, it is unclear which version of the Agreement Godtland

26   was referring to when he indicated that the Band intended to sign the shareholder agreements and

27   distribute the shares.  As is evident from the face of the Agreement (and as testified to by Jenkins), it

28   was subject to a number of revisions to key elements over time, such as the merchandising splits,

United States District Court
For the Northern District of California

1   sponsorship splits, and decision-making structure.  Jenkins Decl. ¶ 11; Greenberg Decl. Ex. B.

2   Thus, Godtland's representation that the Band intended to sign the shareholder agreements simply

3   indicates that they intended to sign an agreement in the future, which agreement in fact was never

4   signed.  The terms of the agreement, as testified to by Godtland, even if that testimony was

5   admissible, are insufficiently definite to create a binding contract.

6            Even if the Court were to consider the terms of the written Agreement submitted by

7   Defendants sufficiently definite to form the basis of a contractual obligation, Plaintiff's own

8   evidence suggests that the parties did not intend for the Agreement to be effective until signed.  As

9   represented by Plaintiff, Godtland testified that the Band "agreed that they would take the

10  shareholder agreements, *sign them* and distribute the shares" and that "they were going to distribute

11  these shares and they were going to *sign off* on these documents, and Stephan [Jenkins] would

12  distribute the shares to each of them."  Godtland Dep. 857:5-16 (emphasis added).  If anything, this

13  testimony indicates the Band's intent that the Agreement not be in effect until signed, as Godtland

14  repeatedly testified to the Band's intent to sign the Agreement.[3]  "[W]here it is part of the

15  understanding between the parties that the terms of their contract are to be reduced to writing and

16  signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it does

17  not become a binding or completed contract."  *Beck v. Am. Health Group Internat'l*, 211 Cal. App.

18  3d 1555, 1562 (1989).  It is undisputed that no written agreement was ever signed by Plaintiff and

19  the other band members.

20           Of course, parties may enter into an agreement without a written agreement.  For example, in

21  *Columbia Pictures Corp. v. De Toth*, 87 Cal. App. 2d 620, 624 (1948), the court upheld an oral

22  agreement when a film director and his agent held a meeting with a studio executive to negotiate a

23  "term contract" governing the director's employment by the studio for a period of time, at which

24  _____

        [3]  The Agreement contains a clause indicating that it would constitute a binding agreement
25  "when signed by the parties hereto . . . ."  Greenberg Decl. Ex. B at 11.  However, in the version
    submitted by Defendants, this clause is crossed out, with the note "reflects current agreements to add
26  TF" written in the margin.  *Id.*  However, neither party has introduced any testimony as to who
    crossed out this paragraph, who made the note in the margin, or even what the document is, aside
27  from mentioning that Plaintiff produced this document in the course of litigation.  *See* Greenberg
    Decl. ¶ 3.  Thus, there is insufficient evidence before the Court from which a reasonable jury could
28  infer that this paragraph being crossed out evidenced any intent by the Band that the Agreement
    need not be in writing.

**United States District Court**
For the Northern District of California

1   meeting the agent indicated his client would sign the term contract upon termination of a preexisting

2   agreement.  The studio executive then repeated the terms of the term contract to the director and

3   asked the director if he agreed, to which the director responded in the affirmative.  *Id.* at 624-25.

4   The three then shook hands and one of them said, "This is a deal."  *Id.* at 625.  The director then said

5   that he agreed to sign the term contract once his preexisting agreement terminated.  *Id.*  In upholding

6   the oral agreement, the court noted that "when the respective parties orally agree upon all of the

7   terms and conditions of an agreement with the mutual intention that it shall thereupon become

8   binding, the mere fact that a formal written agreement to the same effect is to be prepared and signed

9   does not alter the binding validity of the oral agreement."  *Id.* at 629.

10        Here, unlike in *Columbia Pictures*, Godtland's testimony does not speak to whether or not

11   the Band agreed to the specific terms of the Agreement.  The facts and circumstances surrounding

12   the Agreement suggest that the parties did *not* orally agree to be bound by its terms.  *See Banner*

13   *Ent., Inc. v. Super. Ct. (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348, 358 (1998) (mutual

14   intention of oral agreement determined from the surrounding facts and circumstances).  First, the

15   Band never signed the Agreement and never distributed shares.  *See* Jenkins Decl. ¶ 7; Greenberg

16   Decl. Ex. B.  This was contrary not only to the written draft Agreement but Salazar's putative

17   statement to Plaintiff that a lawyer was working out the "vesting of shares" to the band shareholders.

18   Second, from the outset, the Band for the most part did not follow the terms of the written draft

19   Agreement:  it did not follow the merchandising splits provided for in the Agreement (*see* Jenkins

20   Decl. ¶ 14; Greenberg Decl. Ex. B), it did not provide Fredianelli any control over the Band as

21   provided in the Agreement (*see* Fredianelli Dep. 78:2-80:15, 227:5-16, 244:2-8), and it only

22   provided Fredianelli with a share of net touring revenues as opposed to net profits as provided for in

23   the Agreement (*see* Greenberg Decl. Ex. B at 7; Fredianelli Dep. 54:25-55:11, 72:16-73:5).  In fact,

24   the only term of the Agreement that the Band appears to have comported with was the handwritten

25   touring revenue split.

26        In sum, there is no evidence the written Agreement was consented to by all parties.  Nor was

27   it executed in a manner suggesting its existence as a binding contract.  Plaintiff has not met his

28   burden of producing evidence from which a reasonable jury could conclude that the Band consented

1   to be bound by the terms of the Agreement.

2           c.    <u>Agency Authority</u>

3         If Plaintiff's reliance on Godtland's representations regarding the Agreement were sufficient

4   to create a contract, such reliance is problematic for another reason:  Godtland did not have the

5   authority to bind the Band to the Agreement's terms.  An agent may bind a principal to a contract if

6   he has either actual or ostensible authority to do so, or, if the agent is unauthorized to do so, the

7   principal ratifies the agent's unauthorized action.  *See* Cal. Civ. Code §§ 2307, 2330.

8           i.    <u>Actual Authority</u>

9         Actual authority "is such as a principal intentionally confers upon the agent, or intentionally,

10  or by want of ordinary care, allows the agent to believe himself to possess."  Cal. Civ. Code § 2316.

11  In other words, actual authority may be either express, whereby a principal gives it to an agent orally

12  or by writing, or implied, whereby the conduct of the principal indicates an intent to confer actual

13  authority or causes the agent to believe he possesses such authority.  *See* 3 Witkin, Summary of Cal.

14  Law (10th) Agency § 134.   "[A] general manager . . . may not, in the absence of express authority,

15  contract to distribute to employees a portion of the profits of a business . . . ."  *Howard v. Winton*

16  *Co.*, 199 Cal. 374, 379 (1926).  Similarly, a general manager does not have implied authority to sell

17  the business.  *See London v. Zachary*, 92 Cal. App. 2d 654, 657 (1949).

18        Here, Plaintiff has submitted no admissible evidence showing that Godtland had express

19  authority to bind Jenkins or the Band to the Agreement with Plaintiff.  While Plaintiff testifies in his

20  declaration that Godtland told him "he had consulted with the band by conference call and that the

21  points of [their] conversation were approved by the band," this statement is inadmissible hearsay

22  evidence for the point that the Band did in fact approve of Godtland entering the agreement on its

23  behalf.  *Id.* ¶ 9.  Significantly, Plaintiff did not submit direct non-hearsay evidence from Godtland

24  that he had actual authority.  Moreover, Godtland could not have had implied authority to either

25  enter into a profit-sharing agreement with Fredianelli or grant him an ownership stake in the Band,

26  as general managers may not contract to distribute the profits of a business or sell a business absent

27  express authority.  *See Howard*, 199 Cal. at 379; *London*, 92 Cal. App. 2d at 657.  Thus, Fredianelli

28  has not set forth a claim based on Godtland's actual authority to make him a co-owner of the Band.

United States District Court

For the Northern District of California

ii.     Ostensible Authority

Ostensible authority "is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." Cal. Civ. Code § 2317. In order for an agent to bind a principal to a contract based on the agent's ostensible authority, (1) "[t]he person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one"; (2) "such belief must be generated by some act or neglect of the principal sought to be charged"; and (3) "the third person in relying on the agent's apparent authority must not be guilty of negligence." *Ass'd Creditors' Agency v. Davis*, 13 Cal. 3d 374, 399 (1975).

As to the first factor, Plaintiff testifies in his declaration that Godtland told him "he had consulted with the band by conference call and that the points of [their] conversation were approved by the band." *Id.* ¶ 9. Although this point of Fredianelli's declaration is inadmissible to prove that the Band actually did approve of Godtland entering into the Agreement with Fredianelli on behalf of Jenkins or the Band, it is admissible for the limited purpose of establishing Plaintiff's belief that Godtland had that authority and suggests that Plaintiff's belief may have been reasonable.

On the other hand, Plaintiff has not submitted any admissible evidence that conduct of the principals – *i.e.*, Jenkins or the Band – would lead him to believe that Godtland had the authority to bind them to the Agreement. In fact, he testifies to the opposite, that Hargreaves told him that "Godtland . . . did not have the authority to act unilaterally specifically when it came to changing any member['s] financial position in the band." Fredianelli Decl. ¶ 24. Although Salazar, Jenkins, and Godtland did tell Plaintiff that he would eventually become a full-fledged member and co-owner of the Band around the time that he began playing with them in 2000, they never indicated that Godtland would be the one to make that arrangement. *See* Fredianelli Decl. ¶ 6. In fact, Salazar said that "the band made big decisions together, like firing Kevin Cadogan for example . . . ." *Id.* Absent admissible evidence showing that other members of the Band led Plaintiff to believe that Godtland would have the authority to enter into the Agreement on their behalf, Plaintiff cannot demonstrate that Godtland had ostensible authority to do so.

iii.     Ratification

Even if Godtland's offering Plaintiff to enter the Agreement was unauthorized, Defendants may still be bound to it if they ratified the Agreement.  "A ratification can be made . . . where an oral authorization would suffice[] by accepting or retaining the benefit of the act, *with notice thereof*." Cal. Civ. Code § 2310 (emphasis added).  "[R]atification may be proved by circumstantial as well as direct evidence," and "[a]nything which convincingly shows the intention of the principal to adopt or approve the act in question is sufficient."  *StreetScenes v. ITC Entertainment Group, Inc.*, 103 Cal. App. 4th 233, 242 (2002) (quotation marks and citations omitted).  On the other hand, ratification "may also be shown by implication," meaning that, "where an agent is authorized to do an act, and he transcends his authority, it is the duty of the principal to repudiate the act as soon as he is fully informed of what has been thus done in his name, else he will be bound by the act as having ratified it by implication."  *Id.* (alterations, quotation marks, and citations omitted).

Here, Plaintiff does not submit any admissible evidence that the Band knew Godtland had presented Plaintiff with the Agreement.  Moreover, circumstantial evidence suggests they did not have notice of Plaintiff being offered with and accepting the Agreement, as he was never treated in accordance with the Agreement, aside from his taking a twenty-five percent share of the net touring revenues.  As admitted by Plaintiff in his deposition, once he became a member, he did *not* gain a role in the decision-making process of the Band, did not have a say in the Band's business decisions, and did not have a say in the Band's creative decisions, despite the Agreement's explicit provision that "[m]ajority approval of the voting interests of the Corporation(s) will be required with respect to business and creative decisions of the Corporation(s) or the Group . . . ."  *See* Fredianelli Dep. 78:2-80:15; Greenberg Decl. Ex. B at 2.  In addition, he did not take a share of the band's merchandise proceeds until 2007, despite the Agreement's statement that he would immediately take a ten percent share of such revenue.  *See*  Jenkins Decl. ¶ 14; Greenberg Decl. Ex. B at 5.  Such treatment is inconsistent with any ratification theory and thus this argument in favor of contract formation fails, too.

Thus, no contract may be found based on Godtland's putative role as agent.

United States District Court

For the Northern District of California

2.    Partnership

The parties devote the lion's share of their briefing on Plaintiff's first cause of action to the question of whether or not Defendants created a partnership with Plaintiff by way of their conduct.[4] Under California law, "the association of two or more persons to carry on as coowners a business for profit forms a partnership, whether or not the persons intend to form a partnership." Cal. Corp. Code § 16202(a).  Whether a partnership exists depends primarily on the intention of the parties, determined from the terms of the parties' agreement or from the surrounding circumstances. *Greene v. Brooks*, 235 Cal. App. 2d 161, 165-66 (1965).  "It is immaterial if the parties do not designate their relationship as a partnership or if they do not know that they are partners, for intent may be implied from their acts."  *In re Lona*, 393 B.R. 1, 14 (Bankr. N.D. Cal. 2008).  "Ordinarily, the existence of an actual partnership is evidenced by the right of the respective parties to participate in the profits and losses of the business, the contribution by the partners of either money, property or services and some degree of participation by the partners in the management and control of the business."  *Id.*

"To participate to some extent in the management of a business is a primary element in partnership organization, and it is virtually essential to a determination that such a relationship existed."  *Dickenson v. Samples*, 104 Cal. App. 2d 311, 315 (1951).  However, where partners have designated a particular partner to manage the partnership, "the making of the agreement to relinquish control is itself an exercise of the requisite *right to control*."  *Dills v. Delira Corp.*, 145 Cal. App. 2d 124, 132 (1956) (emphasis in original).

Here, while some of the hallmarks of a partnership were present (*e.g.*, sharing of profits), Plaintiff was effectively shut out of the Band's decision-making process.  Rather, Jenkins had the final say as to all creative and business decisions of the Band.  *See* Fredianelli Dep. 78:2-80:15,

_____

[4]  The legal entities that appear to comprise the Band – 3EB Touring, Inc., Stephan Jenkins Productions, Inc., and Third Eye Blind, Inc. – are all corporations.  Thus, it is not clear how a partnership theory fits into this scheme, *i.e.* whether Plaintiff is a partner with the other members of the Band in the operation of the Band as some separate entity from these corporations, whether Plaintiff is a partner with these corporations in the operation of the Band, whether Plaintiff is a partner with Jenkins in the operation of some aspects of the Band, and so forth.  In any event, as discussed herein, Plaintiff has not produced sufficient evidence from which a reasonable jury could conclude he was a partner in the Band or any of its related enterprises.

**United States District Court**
For the Northern District of California

1   227:5-16, 244:2-8; *cf.* Rawson Decl. Ex. A.  There is no evidence that Plaintiff relinquished any

2   control he had in the Band or that Plaintiff ever took part in a decision that Jenkins did not favor.[5]

3          Aside from aspects of his own declaration and alleged deposition corrections prohibited by

4   the sham affidavit rule,[6] Plaintiff puts forth two admissible pieces of evidence supporting his claim

5   he had some control over the Band: (1) Jenkins's deposition admission that he was not the only

6   person to make the decision to hire Mandlebaum as an attorney; and (2) Jenkins's deposition

7   admission that he made the decision to change the touring revenue split with Hargreaves "in

8   consultation with" Plaintiff.  Jenkins Dep. 133:2-11, 395:9-19.  However, neither of these facts

9   suggests that Plaintiff had any say in the final decision, nor has Plaintiff offered evidence suggesting

10  that he did.  Jenkins's admission that he was not the only person to make the decision to hire

11  Mandlebaum as an attorney does not, on its own, suggest that Plaintiff was involved in the decision

12  to hire Mandlebaum, especially in light of Plaintiff's deposition testimony that he had no say in the

13  Band's legal matters.  *See* Fredianelli Dep. 78:12-13, 79:9-21.  That the decision to change the

14  touring revenue split was made "in consultation with" Plaintiff does not imply that Plaintiff had the

15  power to change the outcome.  In fact, such a characterization comports with Plaintiff's deposition

16  testimony that he "renegotiated" his touring split with Jenkins and that Jenkins had previously told

17  Fredianelli "if he wanted to ask for advice, he would ask," but "[a]t the end of the day, he would

18  reserve the right to make the decision . . . ."  Fredianelli Dep. 123:24-124:8, 227:13-16.  Obviously,

19  a reduction of an employee's compensation would involve some degree of consultation with the

20  employee, even if just presented as a "take it or leave it" offer.  However, just because an employee

21

22       [5] At the hearing on this matter, Plaintiff's counsel suggested that Jenkins had been on the
    losing side of a Band decision as it related to the firing of Cadogan.  However, the only evidence on
23  the record of this fact is the statement in Plaintiff's declaration that Jenkins told Plaintiff "in late
    1997/early 1998 that he 'hated Kevin Cadogan, would fire him, but he didn't have the votes of Arion
24  Salazar and drummer Brad Hargreaves' . . . ."  Fredianelli Decl. ¶ 3.  That statement predates
    Plaintiff's joining the Band and does not provide any support for *Plaintiff* taking part in any
25  decisions by the Band.

26       [6] For example, Plaintiff's declaration and deposition contain statements suggesting that he
    did take part in the decision-making structure of the Band and was told by Jenkins that he could
27  have voted to terminate Jenkins as the Band's manager, which are directly contradicted by
    statements in his deposition that he effectively had no control over the Band and was told by Jenkins
28  that he would have no role in the decision-making of the Band.  *See, e.g.*, Fredianelli Decl. ¶ 22;
    Fredianelli Dep. 227:5-16.

United States District Court

For the Northern District of California

1  has the power to accept reduced compensation, negotiate for a different compensation, or leave his

2  job, does not mean that the employee has power over the employer's ultimate decision of what

3  compensation to offer. Thus, there is no record evidence before the Court that Fredianelli ever had

4  any control in a decision by the Band.

5        Several other facts cited by Plaintiff to support the existence of a partnership, such as sharing

6  of net touring revenues, Plaintiff's participation as a party in the *Godtland* case, and Plaintiff's being

7  referenced as a "member" and "officer" of the Band, are insufficient to give rise to a genuine issue

8  of fact as to which Plaintiff was a partner.

9        First, as discussed above, it is undisputed that Plaintiff took between a quarter and a third of

10  the Band's net touring revenue from the time he was made a member in 2003 to the time he was

11  ousted in 2009. *See* Fredianelli Dep. 54:25-55:11, 72:16-73:5, 123:12-125:14; Fredianelli Decl. ¶¶

12  19, 22; Jenkins Decl. ¶ 13. Sharing of net touring revenues with Plaintiff is not inconsistent with

13  Defendants' assertion that Plaintiff's share of net touring revenues constituted wages for his

14  employment with the Band, especially where Defendants support the contention by introducing

15  testimony that the Band's accountant made wage payments to Plaintiff, issued W-2 and 1099 tax

16  forms for such payments, and never filed partnership tax returns or made partner draw payments.

17  *See* Rawson Decl. ¶ 13; Jenkins Decl. ¶ 19; *see also* Cal. Corp. Code § 16202(c)(3)(B) (profit-

18  sharing as form of wages does not create presumption of partnership). Moreover, Plaintiff did not

19  share in the net merchandise proceeds until 2007, demonstrating that Plaintiff did not even

20  participate in a full profit-sharing agreement, as would be expected of a co-owner of a business.

21  Jenkins Decl. ¶ 14.

22        Second, the complaint in the *Godtland* case alleges that Plaintiff was a party to a contract

23  with Godtland by which Godtland took a commission based, in part, on "the band members'

24  songwriting income" for, among other tasks, "us[ing] [his] best efforts to promote the band's *careers*

25  and *efforts* in the entertainment industry." Compl., *Jenkins v. Godtland*, No. C-08-476453 (Cal.

26  Super. Ct., San Francisco County June 18, 2008) ¶¶ 14, 19-20 (emphasis added). While Plaintiff did

27  take part as a party to the *Godtland* case, his participation was premised, at least in part, not on his

28  being a partner in the ownership of the band, but on his allegedly being an individual party to a

23

United States District Court

For the Northern District of California

1    management contract with Godtland.  *See id.*[7]  Plaintiff's individual participation in such a contract

2    comported with its covering "the band members' songwriting income," which would naturally vary

3    for each member of the Band based on their individual contribution to the Band's songwriting, as

4    well as with Plaintiff's representation in an email that Godtland and Plaintiff had an individual

5    agreement regarding Godtland's management commission for Plaintiff.  *See id.* ¶ 14; Rawson Decl.

6    Ex. A; *cf. Love v. The Mail on Sunday*, 489 F. Supp. 2d 1100, 1106-07 (C.D. Cal. 2007)

7    (recognizing that songwriting collaboration does not in and of itself create partnership and that each

8    collaborator is individually entitled to royalties).  Plaintiff's individual participation in the *Godtland*

9    case also comports with the allegation therein that part of Godtland's role as manager was to

10   promote Plaintiff's career and efforts in the entertainment industry, giving rise to individual rights

11   against Godtland.

12          Lastly, Plaintiff was at various times referred to as a "member" and "officer" of the Band.

13   *See, e.g.*, Fredianelli Decl. ¶ 6 ("member"), Ex. G ("officer").  However, such designation does not

14   necessarily make him a legal partner in the Band's operation, especially in light of the evidence

15   showing that Plaintiff had no effective control over the Band.  Being a band "member" does not

16   necessarily denote ownership.  *Cf. Bartels v. Birmingham*, 332 U.S. 126, 127-28 (1947) (members of

17   "name bands" are employees and leader is employer); *Far Out Productions, Inc. v. Oskar*, 247 F.3d

18   986, 998 (9th Cir. 2001) (recognizing band members being hired as employees).  Regarding Plaintiff

19   being labeled an "officer" of the Band, there is only one document referring to him as such, a one

20   page balance sheet under the header of 3EB Touring, Inc.  *See* Fredianelli Decl. Ex. G.  This one

21   document does not establish a genuine dispute as to whether Fredianelli was, in fact, an officer of

22   the Band.  However, even construing the evidence in the light most favorable to Plaintiff, his being

23   an "officer" would not make him a "partner" in the Band in light of his undisputed lack of control

24   over management of the band.  *Cf. GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Services, Inc.*,

25   83 Cal. App. 4th 409, 420-21 (2000) *overturned on other grounds by Reeves v. Hanlon*, 33 Cal. 4th

---

26          [7]  The Court *sua sponte* takes judicial notice of the complaint in the *Godtland* case as a

27   matter of public record not subject to reasonable dispute.  *See* Fed. R. Evid. 201(c)(1); *Molex v. City & County of San Francisco*, No. C-11-1282 YGR, 2012 WL 3042256, at *1 (N.D. Cal. July 25,

28   2012) (at summary judgment phase court may take judicial notice *sua sponte* of documents "directly relevant to the arguments raised by the parties").

United States District Court

For the Northern District of California

1140, 1153-54 (2004) (recognizing that corporations may have nominal officers without control over business).  Plaintiff has not offered evidence from which the Court may reasonably infer a partnership existed between him and the Band members.

Thus, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiff's first cause of action except to the extent it is based on his not receiving his full share of net touring revenues irrespective of ownership, as discussed below.

3.    Profit-Sharing Agreement

Interpreted in the light most favorable to Plaintiff, Defendants *have* made admissions that would support an action for breach of contract to the extent it relates to Plaintiff's right to a share of the net touring revenue.  *See* Pl.'s Opp'n 5.  Regardless of Plaintiff's status as a partner or employee, Jenkins admits that Plaintiff was entitled to at least 25% of the net touring revenue starting in 2003.  Jenkins Decl. ¶ 13.  Plaintiff claims he has not been fully paid.  There is evidence from which it may be inferred that Plaintiff is owed moneys based on the agreement to pay him a share of net touring revenue.  In his July 20, 2009 deposition in the *Godtland* case, Jenkins testified that the Band "moved up on this tour to a profitability somewhere in the estimate of about 52 percent – 51 or 52 percent . . . ."  Jenkins Dep. 243:6-8.  Defendants produced a document in this litigation entitled "3EBT Earning 2008 – 2009" showing total tour earnings of $5,155,590 between March 2008 and August 2009.  Fredianelli Decl. ¶ 57, Ex. F.  If 52 percent of that sum was profit and Plaintiff was entitled to 25 percent of the profit, Plaintiff should have been paid $670,226.70 for his participation in the Band during that period.  Yet, Plaintiff earned, at most, $353,957 during that period.  *See* Rawson Decl. ¶ 9.

Defendants have not proffered an explanation for the nearly $320,000 difference yielded by this calculation.  *See* Defs.' Reply 13.  In a case involving an alleged profit-sharing agreement, the burden of proof at summary judgment and at trial is on the party in control of financial records, in this case Defendants, to demonstrate the party claiming breach was paid accordingly.  *See Wolf*, 107 Cal. App. 4th at 35-36.[8]  In *Wolf*, the court rejected a plaintiff's theory that a profit-sharing

_____

[8] By way of contrast, the court in *Cusano v. Klein*, 280 F. Supp. 2d 1035, 1039-40 (C.D. Cal. 2003), held that the plaintiff had the burden of proving he was not paid in accordance with a profit-sharing agreement at the summary judgment phase, but only after relying on the plaintiff's failure to

United States District Court

For the Northern District of California

1   agreement created a fiduciary relationship, but held that, nevertheless, "in contingent compensation

2   and other profit-sharing cases where essential financial records are in the exclusive control of the

3   defendant who would benefit from any incompleteness, public policy is best served by shifting the

4   burden of proof to the defendant, thereby imposing the risk of any incompleteness in the records on

5   the party obligated to maintain them." *Id.* at 35. As such, breach of contract as to the agreement to

6   pay net touring revenues for March 2008 to August 2009 is an appropriate cause of action.

7          Thus, the Court finds that a contractual obligation to pay a percentage of the net touring

8   revenue exists, and permits Plaintiff to proceed with his breach of contract claim only to the extent it

9   is based on his right to a share of the net touring revenue.

10   B.      Reasonable Value of Services Performed (Second Cause of Action)

11          Plaintiff's second cause of action for reasonable value of services performed, also known as

12   a "quantum meruit" claim, alleges that "[b]etween March 13, 2003 and December 31, 2009, Plaintiff

13   was not paid the reasonable value of the services that he performed for the Band." FAC ¶ 88. "To

14   recover on a claim for the reasonable value of services under a quantum meruit theory, a plaintiff

15   must establish both that he or she was acting pursuant to either an express or implied request for

16   services from the defendant and that the services rendered were intended to and did benefit the

17   defendant." *Ochs v. PacifiCare of Cal.*, 115 Cal. App. 4th 782, 794 (2004). "[I]t is well settled that

18   there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties

19   have an actual agreement covering compensation." *Hedging Concepts, Inc. v. First Alliance*

20   *Mortgage Co.*, 41 Cal. App. 4th 1410, 1419 (1996). However, courts have recognized quantum

21   meruit claims where the actual agreement is not for a certain or readily ascertainable figure. *See*

22   *Chodos v. West Publ. Co.*, 292 F.3d 992, 1001-02 (9th Cir. 2002). For example, in *Chodos* the court

23   recognized a quantum meruit claim where the plaintiff, an author, wrote a treatise based on a

24   contract with a publisher for fifteen percent of the revenues from sales, yet the defendant declined to

25   publish the treatise. *Id.*

26

27   invoke auditing procedures provided for under the profit-sharing agreement. Here, at least as

28   alleged in the complaint, Fredianelli was stonewalled in his attempts to audit the Band's profits. *See* FAC ¶ 53.

United States District Court

For the Northern District of California

1    Here, the fact that the parties had an agreement as to Plaintiff's compensation is dispositive.

2    There is no dispute that Plaintiff was entitled to either twenty-five percent or thirty-three percent of

3    the net touring revenue at any given point between March 2003 and December 2009.  *See* Jenkins

4    Decl. ¶ 13; Fredianelli Decl. ¶ 22.  Moreover, unlike in *Chodos*, where the damages were uncertain,

5    here Plaintiff was entitled to a share of an ascertainable portion of profits.  Thus, the Court need not

6    reach a decision as to whether the monies ultimately paid Plaintiff were reasonable.[9]  Breach of

7    contract rather than quantum meruit lies.

8    The Court **GRANTS** Defendants' motion for summary judgment as to Plaintiff's second

9    cause of action.

10   C.    Constructive Trust (Third Cause of Action)

11   Plaintiff's third cause of action asserts that Jenkins breached a fiduciary duty owed Plaintiff

12   by "causing substantial assets, revenues and profits belonging to the Band to be placed either in his

13   own individual name or into corporations wholly owned by him" and "treating the aforesaid assets

14   belonging to other Band members as his own personal property."  FAC ¶¶ 94-96.  "A cause of action

15   for constructive trust is not based on the establishment of a trust, but consists of fraud, breach of

16   fiduciary duty or [an]other act which entitles the plaintiff to some relief."  *Michaelian v. State Comp.*

17   *Ins. Fund*, 50 Cal. App. 4th 1093, 1114 (1996).  Here, based on the language of the complaint,

18   Plaintiff's third cause of action appears to seek the remedy of a constructive trust based on Jenkins's

19   alleged breach of a fiduciary duty.  *See* FAC ¶¶ 94-96.

20   In order to state a claim for breach of fiduciary duty against Jenkins, Plaintiff must

21   demonstrate the existence of a fiduciary relationship.  *See 1-800 Contacts, Inc. v. Steinberg*, 107 Cal.

22   App. 4th 568, 592-93 (2003).  Here, as discussed above, Plaintiff has not demonstrated that he was

23   made a co-owner of the Band or its related corporations, and thus Jenkins's alleged status as a co-

24   owner of the Band with Plaintiff does not give rise to a fiduciary duty.

25   However, Plaintiff asserts two alternative sources of Jenkins's fiduciary duty towards

26   Plaintiff: Jenkins's serving as Plaintiff's manager and Plaintiff's right to a twenty-five percent share

27   _____

28   [9]  Defendants have submitted substantial evidence suggesting that Plaintiff's compensation was well above the industry standard.  *See* Rawson Decl. ¶¶ 8-10.  Plaintiff has not refuted any of this evidence.  *See* Pl.'s Opp'n 20-21.

27

United States District Court

For the Northern District of California

1  of net profits.  *See* Pl.'s Opp'n 21-22.  Plaintiff cites no admissible evidence supporting that Jenkins

2  actually *was* Plaintiff's manager in an individual capacity.  Rather, Jenkins managed the Band, and,

3  as discussed above, Plaintiff was not a co-owner of the Band, but rather an employee.  *See*

4  Fredianelli Decl. ¶ 20.[10]  As to Plaintiff's argument that Jenkins owed Plaintiff a fiduciary duty to

5  the extent Plaintiff was entitled to a share of the Band's profits, a contract for profit-sharing alone

6  does not give rise to a fiduciary relationship.  *See Wolf v. Super. Ct.*, 107 Cal. App. 4th 25, 34

7  (2003).

8         Thus, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiff's third

9  cause of action for constructive trust.

10  D.     Accounting (Fourth Cause of Action)

11         Plaintiff's fourth cause of action "seeks an[] accounting of the disposition of any and all

12  moneys, property and assets that Defendants Jenkins and or Hargreaves wrongfully received or

13  misappropriated from the Band during the period when Plaintiff was an equal co-owner."  FAC ¶

14  101.  "An action for an accounting . . . is a proceeding in equity for the purpose of obtaining a

15  judicial settlement of the accounts of the parties in which proceeding the court will adjudicate the

16  amount due, administer full relief and render complete justice . . . ."  *Verdier v. Super. Ct. in and for*

17  *City & County of San Francisco*, 88 Cal. App. 2d 527, 530 (1948).  "A cause of action for an

18  accounting requires a showing that a relationship exists between the plaintiff and defendant that

19  requires an accounting, and that some balance is due the plaintiff that can only be ascertained by an

20  accounting."  *Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 179 (2009).  "[A] party to a profit-

21  sharing agreement may have a right to an accounting, even absent a fiduciary relationship, when

22  such a right is inherent in the nature of the contract itself."  *Wolf*, 107 Cal. App. 4th at 34.

23         As with his breach of contract cause of action, Plaintiff's complaint suffers the fatal flaw that

24  the entire action for accounting is premised on him being an "equal co-owner" of the Band at some

25  point.  *See* FAC ¶ 101.  As discussed above, Plaintiff was never an equal co-owner of the Band, and

26  thus cannot have a right to an accounting, at least as pled.  Plaintiff also asserts that Defendants have

27  

28  _____
    [10]  By way of contrast, there is evidence on the record that Godtland represented Plaintiff in
    an individual capacity, as discussed above.  *See* Rawson Decl. Ex. A.

28

**United States District Court**

For the Northern District of California

1   "unaccounted for royalties," yet produces no admissible evidence of such royalties.  *See* Pl.'s Opp'n

2   5, 22; Fredianelli Decl. ¶¶ 33-34.  The only evidence cited by Plaintiff to support a claim for

3   unaccounted for royalties consists of hearsay and conjecture.  *See* Fredianelli Decl. ¶¶ 33-34.  While

4   Plaintiff asserts that a song he wrote was used in a video game but he "never received any advances

5   or royalties from the licensing of the song," he does not introduce any evidence that the licensing of

6   the song generated any royalties in the first place.  *See* Fredianelli Decl. ¶ 46.  It is equally

7   conceivable that the use of the song in a video game was purely promotional and designed to

8   encourage record sales or promote the Band's profile.  Thus, Plaintiff has not produced sufficient

9   evidence to entitle him to an accounting of royalties.

10          Like with his breach of contract action, Plaintiff has proffered at least some evidence that he

11   was not paid his full share of the band's net touring revenues.  Without an accounting, there may be

12   no way by which Plaintiff could determine whether he was entitled to additional compensation.  *See*

13   *Wolf*, 107 Cal. App. 4th at 34 (accounting appropriate where, without an accounting, there may be

14   no way by which a party entitled to a share in profits could determine the amount of profits).  Again,

15   the burden of proof would be on Defendants to demonstrate that Plaintiff was paid accordingly.  *See*

16   *id.* at 35-36.

17          As Plaintiff has neither demonstrated that he was as co-owner of the Band nor shown the

18   existence of any unaccounted for royalties, the Court **GRANTS** Defendants' motion for summary

19   judgment as to his fourth cause of action, except to the extent it is based on his not receiving a full

20   share of the Band's net touring revenues, irrespective of ownership.

21   E.      Declaratory Relief Regarding Ownership of Copyrights (Fifth Cause of Action)

22          In his fifth cause of action "regarding ownership of copyrights," Plaintiff asserts that he "is

23   an author and joint owner of certain songs (and copyrights therein)" for which "[o]ne or more of

24   [the] Defendants is listed as the sole author," and thus he "requests that the Court declare him to be

25   an author of these works."  FAC ¶¶ 102-07.  In response, Defendants have produced evidence

26   showing that the parties *already resolved* any ownership dispute based on Plaintiff's authorship of

27   the songs at issue.  *See* Callazzo Decl. ¶¶ 3-6, 8, Ex. A; Jenkins Decl. ¶ 18.  In response, Plaintiff has

28   produced no evidence of an outstanding, bona fide copyright dispute, but rather asserts that the

United States District Court
For the Northern District of California

1   dispute is about ownership, not royalty amounts, despite the fact that evidence produced by

2   Defendants *directly addresses* the matter of ownership as having been previously settled.  *See, e.g.*,

3   Callazzo Decl. Ex. A (email from Plaintiff's attorney "confirm[ing] that Mr. Fredianelli owns and

4   controls the following . . . .").  Although the materials submitted by Defendants suggest that, as of

5   2010, there was a dispute as to the song "Carnival Barker," Plaintiff has submitted no evidence or

6   argument that he is entitled to ownership of that song.  *See* Callazzo Decl. ¶ 7, Ex. A.  Lastly,

7   Plaintiff's argument that he is entitled to unaccounted for royalties and touring participation monies

8   is inapposite; this cause of action is about declaratory relief for ownership of songs.  *See* Pl.'s Opp'n

9   22-23.

10       Thus, the Court **GRANTS** summary judgment as to Plaintiff's fifth cause of action.

11  F.       Declaratory Relief Regarding Ownership of Trademarks (Sixth Cause of Action)

12       Plaintiff's sixth cause of action asserts that he is an author of the "Third Eye Blind" and

13  "3EB" trademarks registered by Defendant Stephan Jenkins Productions, Inc.  *See* FAC ¶¶ 108-113.

14  "[A] person who remains continuously involved with the group and is in a position to control the

15  quality of its services retains the right to use of the mark, even when that person is a manager rather

16  than a performer."  *Robi v. Reed*, 173 F.3d 736, 740 (9th Cir. 1999).  Here, Plaintiff has produced no

17  evidence showing continuous involvement in the Band.  According to his own declaration, Plaintiff

18  played with the Band under the name Third Eye Blind from 1993 to 1994, left the Band from 1994

19  to 1999, rejoined the Band from 1999 to 2009, and has not played with the Band since 2009.  *See*

20  Fredianelli Decl. ¶¶ 2-5, 44.  On the other hand, Jenkins has played under the name Third Eye Blind

21  continuously since before 1993, while Hargreaves has played under the name Third Eye Blind

22  continuously since 1995.  *See* Jenkins Decl. ¶¶ 2-3; Hargreaves Decl. ¶ 2.  Plaintiff admits that

23  Jenkins "was the band leader . . . ."  Fredianelli Decl. ¶ 39.  Plaintiff has not submitted evidence

24  sufficient to demonstrate either his continuous involvement with the Band or his ability to control

25  the quality of its service.

26       The Court therefore **GRANTS** summary judgment as to his sixth cause of action.

27

28

United States District Court

For the Northern District of California

1

G.      Alternative Relief

2          Plaintiff urges that, if the Court is inclined to grant Defendants' motion for summary

3   judgment, it grant him permission to amend his complaint to plead an additional cause of action for

4   violation of California Labor Code section 2802 ("section 2802") or permit Plaintiff to conduct

5   additional discovery before ruling on Defendants' motion. *See* Pl.'s Opp'n 24-25.

6          In support of a claim for relief under section 2802, Plaintiff states that portions of Plaintiff's

7   participation in the Band's net touring revenue were used to fund other expenses of the Band,

8   including recording and legal expenses. *See id.* at 24.  However, section 2802 provides that "[a]n

9   employer shall indemnify his or her employee for all necessary expenditures or losses *incurred by*

10  *the employee* in direct consequence of the discharge of his or her duties . . . ."  Cal. Lab. Code §

11  2802 (emphasis added).  Plaintiff has submitted no evidence of expenses he incurred while

12  discharging his duties, much less any argument why such expenditures were necessary.  Rather, he

13  appears to be arguing that, since he was paid from net touring revenues, any expenditures out of

14  those revenues would give rise to an indemnification claim under section 2802.  However, this

15  argument confuses a share of *net* revenues, to which Plaintiff was entitled, with a share of *gross*

16  revenues, to which Plaintiff was not entitled.  By definition, Plaintiff's compensation agreement for

17  net revenues incorporated expenses.

18          Thus, the Court **DENIES** Plaintiff's request for leave to amend his complaint to add a

19  section 2802 claim.

20          As for permitting Plaintiff to conduct more discovery, Plaintiff is correct that "[i]f a

21  nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts

22  essential to justify its opposition, the court may . . . allow time . . . to take discovery . . . ."  *See* Fed.

23  R. Civ. P. 56(d).  However, in support of his argument, Plaintiff's declaration only states that "[o]ne

24  of the reasons [he has] been abandoned by so many attorney[]s in this case has been their refusal to

25  conduct adequate discovery."  *See* Fredianelli Decl. ¶ 48; Pl.'s Opp'n  24-25.  He does not include

26  compelling testimony for why he failed to take the depositions of Godtland and Salazar, who he

27  claims would corroborate his testimony.  *See* Fredianelli Decl. ¶ 48.

28          Thus, Plaintiff's request for additional time to conduct discovery is **DENIED**.

1     However, as discussed above, the parties have produced sufficient evidence to suggest that

2     an appropriate cause of action would lie for breach of contract or an accounting on the grounds that

3     Plaintiff did not receive his full share of net touring revenues. *See Bishop v. Kelley*, 100 Cal. App.

4     2d 775, 786 (1950) (action for accounting where calculation of net profits was in dispute); *Thacker*

5     *v. American Foundry*, 78 Cal. App. 2d 76, 84-85 (1947) (breach of contract claim where calculation

6     of net profits was in dispute).  Defendants would not suffer prejudice from Plaintiff being able to

7     proceed with either claim, as they have been on notice that Plaintiff sought his share of the Band's

8     net touring revenues, given his complaint's repeated references to not receiving his full share of the

9     Band's profits as well as Jenkins's and Hargreaves's alleged misappropriation of the Band's profits.

10    *See, e.g.*, FAC ¶¶ 77, 85B-C, 90-91, 95, 101.

11    Thus, as discussed above the Court permits Plaintiff to proceed with his causes of action for

12    breach of contract and accounting based on Defendants' failure to pay his full share of the Band's

13    net touring revenue.

## VI.   CONCLUSION

15    In sum, the Court **GRANTS** Defendants' motion for summary judgment as to all of

16    Plaintiff's causes of action permits except to the extent his causes of action for breach of contract

17    and accounting are based on his not receiving his agreed-to share of net touring revenues.

18    This order disposes of Docket No. 171.

20    IT IS SO ORDERED.

22    Dated:  March 14, 2013

                                        _____
24                                      EDWARD M. CHEN
                                        United States District Judge

32